# COURT OF APPEALS OF VIRGINIA

---

**Record No. 2002-24-2**

---

AARON RANDOLPH CARTER
v.
COMMONWEALTH OF VIRGINIA

---

Present: Judges Beales, O'Brien and Ortiz
Argued at Richmond, Virginia

Opinion Issued June 9, 2026[*]

---

**FROM THE CIRCUIT COURT OF THE CITY OF FREDERICKSBURG**
Gordon F. Willis, Judge

James Joseph Ilijevich for appellant.

Aaron J. Campbell, Senior Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

---

**MEMORANDUM OPINION BY
JUDGE MARY GRACE O'BRIEN**

Following a joint trial, a jury convicted Aaron Randolph Carter (appellant) and Lorenzo Adonis Brooks of second-degree murder of Jasiah Smith and use of a firearm in the commission of a felony. Appellant contends that the circuit court erred in joining the trials. Appellant further argues that the court erred in finding sufficient evidence to support the jury's conclusion that appellant was one of the shooters and that he acted with malice. Finding no error, we affirm.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

BACKGROUND

"[W]hen a criminal appellant challenges the sufficiency of the evidence, we recite the evidence below 'in the "light most favorable" to the Commonwealth, the prevailing party in the trial court.'" *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).

On March 26, 2023, around noon, Brooks and appellant met at a strip mall in Fredericksburg, where cameras from one of the stores—Manshue Check & Cash—recorded them getting into a white Impala that belonged to appellant's mother. Appellant had short dreadlocks and wore a white sweatshirt with a distinctive design on both the front and back. Brooks wore a dark blue or black jacket, black pants, and black shoes with white soles. At trial, Officer Uyurre Brown-Kaleopaa, who knew appellant and Brooks from his former assignment as the resource officer at a local high school, identified them in the store's video.

At 1:16 p.m. that day, the white Impala pulled into a parking spot for Brooks's home at 714 Denton Circle. Appellant, Brooks, and one of their acquaintances got out of the car and started walking toward Chadwick Court.

Several neighborhood residents had security cameras that captured the incident. Video footage showed a group of young men gathering in the parking lot of Chadwick Court. Around 2:55 p.m., an altercation broke out among several individuals behind a parked car; still-shots of the video footage showed two people raising their arms. Five seconds later, Brooks backed up with his arm outstretched and a gun in his hand, pointing at the area behind the parked car. Several other individuals ran away. After another five seconds, appellant emerged from behind the car and also ran away.

Kerri Farr witnessed the shooting. She and her husband were walking near Chadwick Court where she saw a group of people in "a semicircle around one young man." She heard a

- 2 -

loud noise, and when she looked over, she saw "somebody raise their arm and shoot [the young man]," who fell to the ground. She observed two men "standing over him, and . . . empty[ing] the rest of the gun into his body." At trial, Farr testified that she remembered that one of the men standing over the man on the ground had "small little dreadlocks and a white hoodie with a design on the front" and that he had his arm "extended shooting the victim." After the shooting, she saw the men scatter and one car speed away.[2]

William Wallace, a Chadwick Court resident, went outside after hearing a loud noise and discovered Smith in a fetal position with "a hole [i]n his chest." Wallace saw a gun next to Smith. Because he was worried someone might get hurt, he put the gun in a pizza box in his backyard. Later that day, Wallace approached Fredericksburg Police Department (FPD) Detective Corey Dobson, who recovered the gun, noting that it was loaded with the safety on.

Detective Johnny Wright reviewed the neighborhood residents' security camera footage and determined that appellant and Brooks had fled from Chadwick Court to 714 Denton Circle after the shooting. The two men were wearing the same clothes as earlier in the day at Manshue Check & Cash. Both individuals were recorded running with one hand in their pocket.

A camera facing the backyard of 710 Denton Circle showed appellant and Brooks jump the fence of 714 Denton Circle at 2:56 p.m., just one minute after the shooting. The video showed one person wearing a black top, the other a white one. At 3:02 p.m., the camera captured a blue object being thrown over the fence into the wooded area behind the houses. Two minutes later, at 3:04 p.m., the front-facing camera of 710 Denton Circle recorded two individuals get into the white Impala parked in front of 714 Denton Circle and drive off.

---

[2] Police officers later located that car but found "[n]othing significant" in it.

At the time, Taylor Rakes lived at 716 Denton Circle. She observed "[t]wo males hop the fence" of 714 Denton Circle. She testified that they threw something "dark-colored" "down the hill," and she heard a "loud clank."

Responding to 911 calls, FPD officers arrived at Chadwick Court and found Smith, who was unresponsive, on the ground. Smith was taken to the hospital, where he was pronounced dead. The medical examiner determined that Smith died from "[m]ultiple gunshot wounds"; she identified "a total of twelve gunshot wound injuries." She recovered two bullet fragments from Smith's body.

During the investigation, detectives found eleven nine-millimeter spent cartridge casings as well as a bullet fragment in the Chadwick Court parking lot. A few days after the shooting, the FPD executed a search warrant for 714 Denton Circle. During that search, Rakes approached Detective Dobson and told him about seeing two individuals hop the fence and throw something into the wooded area behind the houses. Detective Dobson subsequently discovered two firearms in that area, one on the ground, the other in an unraveled blue shirt. Both guns were nine-millimeter Glock pistols.

Megan Korneke, a forensic scientist in the firearm section of the Virginia Department of Forensic Science, examined all of the guns and cartridges involved in this case. She concluded that the two guns recovered from the wooded area behind 714 Denton Circle fired all of the cartridges found at the scene of the shooting—four of which were fired by one of the guns, seven by the other one. Smith's gun did not fire any of the cartridges found in connection with this case. Korneke also examined two bullet fragments recovered from Smith's body, both of which were fired by one of the guns found behind 714 Denton Circle.

FPD Detective Gloria Mehia analyzed appellant's phone data and determined that the location "arc"—a line showing where the analyzed phone was located—"r[a]n through the area

- 4 -

of the crime scene" at 2:53 p.m. on March 26, 2023. Her analysis also showed that, between 3:05 p.m. and 3:20 p.m. that day, the phone location moved from Brooks's home at Denton Circle toward appellant's home.

Detectives found the white Impala parked close to appellant's home. In the vehicle, the detectives also discovered documents with appellant's name and phone number on them. A backpack in the trunk of the car contained live nine-millimeter rounds of ammunition. At trial, appellant's mother testified that she had purchased the Impala for appellant.

Detective Dobson located appellant and Brooks together in Marlboro, Maryland, and the men were extradited to Virginia. Both were charged with first-degree murder and the use of a firearm in the commission of a felony.

The Commonwealth moved to join the trials and submitted copies of the autopsy report, the death investigation, and firearms identification certificates. The Commonwealth proffered that on March 26, 2023, "an altercation" broke out between appellant, Brooks, and Smith. The Commonwealth also proffered that there was "direct video evidence of Mr. Brooks shooting, circumstantial evidence of [appellant] shooting." Both fled to Brooks's residence, jumped the fence, and threw two guns—which fired all of the recovered cartridges in this case—into the wooded area. Finally, the Commonwealth proffered that evidence would show the two men left in appellant's Impala and were later found together in Maryland. The Commonwealth argued that joining the trials would not prejudice the defendants because the cases relied on the same evidence and neither defendant confessed nor gave a statement.

Appellant opposed the motion to join the trials, contending that it would allow the jury to find a common plan or intent without having any evidence of that. The court granted the motion, finding "that the Commonwealth has shown good cause to join the two [d]efendants' trials." The court also ruled that neither defendant would be prejudiced by joining the trials.

After trial, the jury found both defendants guilty of second-degree murder and using a firearm in the commission of a felony, and each was sentenced to 43 years' imprisonment with 15 years suspended.

## ANALYSIS

### I. Standard of Review

#### A. Joinder

> Code § 19.2-262.1 provides that "for good cause shown, the court shall order persons charged with participating in contemporaneous and related acts or occurrences or in a series of acts or occurrences constituting an offense or offenses, to be tried jointly unless such joint trial would constitute prejudice to a defendant."

*Hargrove v. Commonwealth*, 77 Va. App. 482, 496 (2023). To prevail on appeal, "[a] criminal defendant must demonstrate that a joint trial caused 'actual,' 'legally cognizable prejudice' to his rights." *Id.* (quoting *Allen v. Commonwealth*, 58 Va. App. 618, 623 (2011)). "'The underlying determinations of good cause and prejudice involve a case-by-case exercise of the trial court's discretion' and will not be reversed on appeal absent an abuse of discretion, . . . ." *Id.* (quoting *Allen*, 58 Va. App. at 622-23).

#### B. Sufficiency of the Evidence

"In reviewing a challenge to the sufficiency of the evidence to support a conviction, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Melick v. Commonwealth*, 69 Va. App. 122, 144 (2018) (quoting *Kelly v. Commonwealth*, 41 Va. App. 250, 257 (2003) (en banc)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Raspberry v. Commonwealth*, 71 Va. App. 19, 29 (2019) (quoting *Burrous v. Commonwealth*, 68 Va. App. 275, 279 (2017)). "In conducting our analysis, we are mindful that 'determining the

credibility of the witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact, who has the ability to hear and see them as they testify.'" *Id.* (quoting *Miller v. Commonwealth*, 64 Va. App. 527, 536 (2015)). "Thus, we will affirm the judgment of the trial court unless that judgment is 'plainly wrong or without evidence to support it.'" *Id.* (quoting *Kelly*, 41 Va. App. at 257).

## II. Joinder

Appellant argues that the court erred in granting a joint trial because there "was no direct evidence that either defendant actually fired one of the weapons" and there was insufficient evidence to show "more than one individual fired into" Smith. According to appellant, there was no evidence of a joint plan and "[a]bsent evidence of such a plan," evidence against Brooks would be imputed against appellant. Appellant also contends that the joint trial prejudiced him because the defendants showed "different degrees of culpability."

"[L]egally cognizable prejudice" through joinder "occurs only when 'there is a serious risk that a joint trial . . . compromise[d] a specific trial right of one of the defendants' or when the joinder . . . 'prevent[ed] the jury from making a reliable judgment about guilt or innocence.'" *Hargrove*, 77 Va. App. at 496 (all but first alteration in original) (quoting *Allen*, 58 Va. App. at 623-24). "Prejudice may also result in a complex case where the co-defendants exhibit markedly different degrees of culpability." *Barnes v. Commonwealth*, 22 Va. App. 406, 412 (1996). But "[t]he fact that the evidence against one defendant is stronger than the evidence against other defendants does not in itself justify severance." *Allen*, 58 Va. App. at 624 (quoting *United States v. Brooks*, 957 F.2d 1138, 1145 (4th Cir. 1992)).

Contrary to appellant's argument, this is not a "complex case where the co-defendants exhibit[ed] markedly different degrees of culpability." *Barnes*, 22 Va. App. at 412. Here, both defendants faced the exact same charges—first-degree murder and the use of a firearm therein—

and the Commonwealth used identical evidence against both: the same witnesses, photographs, and videos. *See Flowers v. Commonwealth*, 84 Va. App. 143, 151-55 (2025) (affirming a joinder of trials where the primary evidence "was in the form of videos of the shootings" and both defendants "attempted to cast blame" on the other defendant). Neither defendant gave a statement or made a confession that could be used against the other. *See Barnes*, 22 Va. App. at 412 (stating that "prejudice may be found to result where evidence, inadmissible against a defendant if tried alone, is admitted in a joint trial"); *see also Hargrove*, 77 Va. App. at 502 (affirming the joinder of trials where sufficient evidence supported a finding of guilt for one of the co-defendants regardless of the other defendant's confession). The fact that an eyewitness testified that she saw appellant shoot and additional video evidence showed Brooks shooting as well does not warrant separate trials. *See Allen*, 58 Va. App. at 624 ("Criminal defendants 'are not entitled to severance merely because they may have a better chance of acquittal in separate trials.'" (quoting *Zafiro v. United States*, 506 U.S. 534, 540 (1993))).

We also disagree with appellant's contention that the fact that the two recovered bullet fragments were fired by only one of the guns means that there was no evidence "that more than one individual fired into the decedent." The medical examiner identified "a total of twelve gunshot wound injuries," and the FPD recovered eleven cartridge casings from the scene of the shooting, four of which came from one of the guns and seven from the other. From that evidence, the jury could have reasonably concluded that both guns "fired into" the decedent's body.

Finally, appellant contends that the Commonwealth did not provide evidence that his and Brooks's actions "were part of a [joint] plan." But Code § 19.2-262.1 does not require proof of a shared plan, only proof of participation "in contemporaneous and related acts or occurrences or in a series of acts or occurrences constituting an offense or offenses." Further, there is sufficient

evidence for the jury to conclude that the two men were acting in concert. They were seen together a couple of hours before the incident, there is evidence of both shooting Smith, they ran to Brooks's residence together, disposed of the two guns there, left together in the Impala, and were both found in Maryland two weeks later.

Accordingly, because appellant failed to show any "trial right which was compromised or any basis for concluding [that] the jury was prevented from making a reliable judgment about his guilt or innocence," *Allen*, 58 Va. App. at 625 (quoting *Barnes*, 22 Va. App. at 413), the court did not abuse its discretion in granting a joint trial.

### III. Sufficiency of the Evidence

#### A. Identity

Appellant argues that Farr did not specifically identify him as one of the shooters and that her testimony was contradicted by statements she made during a preliminary hearing. Appellant also repeats the argument that only one of two guns recovered from behind Brooks's residence was shown to have "discharged projectiles recovered from the decedent."

"At trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013) (quoting *Blevins v. Commonwealth*, 40 Va. App. 412, 423 (2003)). Like any element of a crime, identity may be proven by circumstantial evidence. *See Commonwealth v. Moseley*, 293 Va. 455, 465 (2017) (affirming defendant's convictions for breaking and entering and grand larceny when he was seen pulling away from the curb next to the burgled residence at the relevant time, was arrested near the second burglary, and his vehicle contained stolen items).

"[C]ircumstantial evidence is competent and is entitled to as much weight as direct evidence provided that the circumstantial evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Smith v. Commonwealth*, 85 Va. App. 435, 456 (2025) (alteration

in original) (quoting *Kelley v. Commonwealth*, 69 Va. App. 617, 629 (2019)). "This Court does not view circumstantial evidence in isolation." *Id.* (quoting *Lucas v. Commonwealth*, 75 Va. App. 334, 346-47 (2022)). "Rather, the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion.'" *Lucas*, 75 Va. App. at 347 (quoting *Karnes v. Commonwealth*, 125 Va. 758, 764 (1919)). "The pertinent question in this appeal is whether a rational factfinder, in light of all the evidence, could have rejected [the defendant's] theories of innocence and found him guilty beyond a reasonable doubt." *Walker v. Commonwealth*, 79 Va. App. 737, 748 (2024) (alteration in original) (quoting *Moseley*, 293 Va. at 464).

Here, the totality of the direct and circumstantial evidence was sufficient for a rational factfinder to reject appellant's hypothesis that he did not shoot Smith. Officer Brown-Kaleopaa, who knew appellant from the local high school, identified him in the Manshue Cash & Check video, wearing a white sweatshirt with a distinctive design on it and having short dreadlocks. The officer also identified Brooks. Both got into appellant's white Impala, which appellant's mother testified she bought for him. That white Impala then parked in front of 714 Denton Circle, Brooks's residence at the time. Both men emerged from the vehicle and walked toward Chadwick Court.

Farr testified that she saw two men standing over Smith and "empty[ing] the rest of the gun into his body." She specifically remembered "one young man that had . . . small little dreadlocks and a white hoodie with a design on the front," who had an arm "extended shooting the victim." This exactly described appellant's appearance on the day of the shooting. Further, video footage showed appellant emerging from behind the vehicle where Smith's body was found.

Appellant's argument that Farr's testimony was "challenged" by her statements made in a preliminary hearing ignores that (1) Farr explained the "difference" in her testimony,[3] (2) it is the factfinder's prerogative to determine credibility, *Raspberry*, 71 Va. App. at 29, and (3) we review the record in the light most favorable to the Commonwealth, which includes discarding evidence in conflict with that of the Commonwealth. *Bowman v. Commonwealth*, 290 Va. 492, 494 (2015).

Using several home security cameras in the neighborhood, Detective Wright determined that appellant and Brooks fled from the Chadwick Court parking lot to Brooks's residence at 714 Denton Circle. Both ran with their hoods up and one hand in their pocket. Brooks's neighbor, Rakes, saw them jump the fence behind Brooks's house and throw an item into the wooded area behind the house, making a "loud clank." Another neighbor's security camera also recorded these actions.

A few days later, the FPD recovered two guns from that wooded area and forensic examiners found that all of the cartridges recovered from the Chadwick Court parking lot were fired by those two guns. Similarly, two recovered bullet fragments were also fired by one of those two guns.

Appellant's argument that the two bullet fragments recovered from Smith's body were fired by only one of the guns and thus there was no evidence that he "fired into" Smith is also unconvincing. As explained above, the jury could have reasonably concluded that both guns contributed to Smith's death because the medical examiner identified twelve gunshot wounds

---

[3] The alleged difference in her testimony was that in the preliminary hearing she stated that four people were "standing over [Smith] shooting," while at trial she said it was two people. She explained that "[t]here were four people standing there. . . . One shot. There were two guys that were standing more in front of the victim." The jury was free to credit that explanation. *Bazemore v. Commonwealth*, 42 Va. App. 203, 213 (2004) (en banc) (explaining that the jury is "free to believe or disbelieve, in part or in whole, the testimony of any witness").

and the FPD recovered eleven cartridge casings—four of which came from one of the guns from behind Brooks's house, seven from the other one. Additionally, the FPD found a backpack in appellant's white Impala containing unfired nine-millimeter bullets.

Finally, a camera on 700 Denton Circle shows two individuals coming from 714 Denton Circle and getting into appellant's white Impala parked in a spot reserved for 714 Denton Circle; they left together. Appellant and Brooks were later discovered together in Maryland. "Any flight at a time when it may be to avoid arrest, prosecution, or confinement tends to show a consciousness of guilt." *Langhorne v. Commonwealth*, 13 Va. App. 97, 103 (1991).

These facts were sufficient to support the jury's determination that appellant was one of the shooters who killed Smith. *See Moseley*, 293 Va. at 464.

### B. Malice

Although he acknowledged that a jury can infer malice based on the use of a deadly weapon, appellant contends that "there were many other facts and circumstances which clearly negate[d] th[at] inference" and that the shooting was "a result of 'heat of passion.'" According to appellant, there was no evidence of any altercation or motive for the shooting. Appellant also argues that "[t]he presence of a weapon in the hand of a person involved in an armed altercation almost certainly creates a strong emotion such as anger o[r] fear for all of the participants."

Malice is a required element for murder of any kind. *Essex v. Commonwealth*, 228 Va. 273, 280 (1984). Malice is "the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will." *Watson-Scott v. Commonwealth*, 298 Va. 251, 255-56 (2019) (quoting *Dawkins v. Commonwealth*, 186 Va. 55, 61 (1947)). "Notably, 'malice may be implied from the deliberate use of a deadly weapon.'" *Id.* (quoting *Smith v. Commonwealth*, 239 Va. 243, 264 (1990)). "Whether or not an accused acted with malice is generally a question of fact

and may be proved by circumstantial evidence." *Flowers*, 84 Va. App. at 163 (quoting *Haefele v. Commonwealth*, 75 Va. App. 591, 602-03 (2022)).

"[H]eat of passion is a defense based on a defendant's lack of malice." *Id.* (quoting *Washington v. Commonwealth*, 75 Va. App. 606, 619 (2022)). "It 'refers to the *furor brevis* which renders a man deaf to the voice of reason.'" *Id.* (quoting *Meade v. Commonwealth*, 74 Va. App. 796, 814 (2022)). "'[W]hen provocation reasonably produces fear' or anger, causing 'one to act on impulse without conscious reflection,' no malice exists." *Washington*, 75 Va. App. at 619 (alteration in original) (quoting *Rhodes v. Commonwealth*, 41 Va. App. 195, 200 (2003)). "Malice and heat of passion are mutually exclusive; malice excludes passion, and passion presupposes the absence of malice." *Dandridge v. Commonwealth*, 72 Va. App. 669, 681 (2021) (quoting *Canipe v. Commonwealth*, 25 Va. App. 629, 643 (1997)).

Here, the jury was instructed on the difference between malice and heat of passion. The jury is presumed to follow the trial court's instructions. *Tizon v. Commonwealth*, 60 Va. App. 1, 14 n.5 (2012). The jury found appellant guilty of second-degree murder and therefore found that the Commonwealth provided sufficient evidence of malice. That factual determination is supported by the record. Although Wallace found a gun on Smith's body, there is no evidence that he used or threatened to use it. Detective Dobson noted that the safety was on when he recovered Smith's gun. The gun had not been fired and none of the cartridges recovered from the crime scene came from that gun. The only blood discovered was Smith's own blood. Finally, evidence supported the jury's conclusion that appellant fired one of the guns that killed Smith, and "malice may be implied from the deliberate use of a deadly weapon." *Watson-Scott*, 298 Va. at 256 (quoting *Smith*, 239 Va. at 264). Thus, the court did not err in finding that sufficient evidence supported the jury's finding of malice.

CONCLUSION

For these reasons, we affirm the circuit court's judgment.

*Affirmed.*